22CA0477 Peo v Bannan 03-26-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0477
Boulder County District Court No. 19CR2042
Honorable Norma A. Sierra, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Justin Lewis Bannan,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE WELLING
Grove and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 26, 2026

Philip J. Weiser, Attorney General, Grant R. Fevurly, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

The Noble Law Firm, LLC, Antony Noble, Jennifer Tuttle, Lakewood, Colorado, for Defendant-Appellant

¶ 1     Justin Lewis Bannan appeals the judgment of conviction entered after a jury found him guilty of four felonies. We affirm.

I.     Background

¶ 2     On October 16, 2019, A.M., an acupuncturist, arrived at her office. As she opened her office door, Bannan, who was sitting in the corner of her office, shot her in the arm. Bannan was a co-owner of the building where A.M. worked. Police arrived and arrested Bannan without incident. A.M. told police that after Bannan shot her, he said to her, "I'm sorry, the Russian mafia is after me."

¶ 3     Bannan was charged with two counts of attempted first degree murder, two counts of first degree assault, possession of a weapon on school grounds,[1] and four crime of violence sentence enhancement counts. Bannan pleaded not guilty by reason of insanity (NGRI). His case proceeded to a jury trial on August 30, 2021.

_____

[1] This charge appears to be based on an allegation that Bannan possessed a firearm on the University of Colorado campus, which is near A.M.'s office. This charge, however, was voluntarily dismissed by the People prior to trial, so there is limited information about it in the record.

¶ 4     At trial, Bannan's defense was that he was unable to form the requisite mental state for the charges under both an insanity and involuntary intoxication theory. Bannan played defensive tackle for several teams in the National Football League (NFL), and with respect to NGRI, he claimed that multiple concussions that he sustained during his football career negatively affected his brain and prevented him from forming the requisite mental state. As for involuntary intoxication, Bannan argued that he was overprescribed Adderall, which also negatively affected his brain. The People argued that Bannan was able to form the requisite mental state at the time of the offense. Both sides presented multiple experts and lay witnesses related to these issues.

¶ 5     The jury convicted Bannan of attempted first degree murder (extreme indifference); first degree assault (deadly weapon); first degree assault (extreme indifference); and the lesser included offense of attempted second degree murder. After merging some of the counts, the trial court sentenced Bannan to two concurrent sentences of sixteen years in the custody of the Department of Corrections.

## II.    Analysis

¶ 6    Bannan contends that the trial court erred by (1) limiting the scope of his expert witnesses' testimony; (2) limiting the scope of his lay witnesses' testimony; (3) limiting his cross-examination of the prosecution's expert witnesses; (4) allowing the prosecution to elicit irrelevant testimony on cross-examination from his expert witness; and (5) denying his request to call an expert witness in surrebuttal. Bannan also contends that cumulative error warrants reversal. We address, and reject, each contention in turn below.

### A.    Standard of Review

¶ 7    We review a trial court's evidentiary decisions for an abuse of discretion. *People v. Murphy*, 2021 CO 22, ¶ 16. A trial court abuses its discretion when its decision was "manifestly arbitrary, unreasonable, or unfair, or based on a misunderstanding or misapplication of the law." *People v. Heredia-Cobos*, 2017 COA 130, ¶ 6.

### B.    Scope of Expert Testimony

¶ 8    First, Bannan argues that the trial court erred by restricting his experts' testimony to the contents of their reports. The People respond that the law requires such a limitation, otherwise criminal

defendants would be allowed to ambush the People with unexpected arguments at trial. We conclude that, even if the court abused its discretion by imposing this limitation, it didn't reversibly err.

### 1. Additional Facts

¶ 9 At his arraignment, Bannan entered an NGRI plea. He asserted that he suffered from chronic traumatic encephalopathy (CTE)[2] or other brain trauma that constituted a mental disease or defect. As required by statute, the trial court ordered him to undergo a sanity evaluation, which he did.

¶ 10 As part of his pretrial disclosures and as required by section 16-8-103.6(2)(a), C.R.S. 2025, Bannan disclosed to the People the names and addresses of twelve treatment providers. Soon after, Bannan supplemented this disclosure with two more names and addresses of treatment providers. The trial court then ordered that Bannan supplement this information with the providers' telephone numbers, the approximate dates of treatment, a general description of the service each provided, and any diagnosis. Then, pursuant to

---

[2] CTE is a brain disease linked to repeated trauma to the head. *See Mayo Clinic, Chronic traumatic encephalopathy,* https://perma.cc/SQT8-4RFN.

Crim. P. 16, Bannan disclosed seven expert witnesses. From our review of the record, there isn't any indication that Bannan failed to comply with his statutory obligation to provide the People with reports from these seven expert witnesses.

¶ 11    The People then filed a motion in limine to exclude any evidence relating to CTE on the grounds that no treatment provider had diagnosed Bannan as having such disease or disorder. The trial court addressed this motion at a pretrial hearing. At the hearing, the parties discussed whether Bannan would be seeking to introduce evidence related to CTE. The parties clarified that doctors can't diagnose anyone with CTE until an autopsy is performed after the patient's death. But defense counsel explained that their experts would opine that, based on Bannan's behavior, conduct, and head trauma history, they expect that after Bannan's death he would be diagnosed as having suffered from CTE during his lifetime.

¶ 12    The People objected, arguing that this testimony wouldn't be relevant because it didn't include a nexus between Bannan's brain trauma, including CTE, and his ability to form the requisite mental state for the charged conduct. Defense counsel responded that this

5

connection wasn't "something [the experts] would be able to opine to because that [was] a question for the jury based on the evidence presented." But ultimately, defense counsel represented that they believed that the expert testimony, when taken as a whole, would show that CTE prevented Bannan from forming the requisite mental state for the charged conduct.

¶ 13 The trial court allowed the defense to file a written response to the People's motion in limine and didn't address the issue again until the morning of the first day of trial. That morning, the trial court explained that "[t]o the extent that the [c]ourt finds there is . . . an expert whose expertise permits that witness to render an expert opinion that [Bannan] presented consistent with other individuals who have later been diagnosed with CTE, the [c]ourt may be in a position of permitting that testimony." Defense counsel then clarified that the experts could testify that "to a reasonable degree of medical probability" that Bannan suffers from CTE. The trial court asked whether a report contained such an opinion and ruled that if there wasn't a report that did, then any testimony to that regard wouldn't be allowed.

¶ 14    The trial court revisited this matter and ruled on what each expert could testify to at trial.  It repeated its earlier ruling that the experts would be limited to testifying to matters only in their reports.  But it clarified that it would allow Dr. Marc Treihaft, one of the defense experts, to testify about his impression that Bannan's symptoms may be a result of multiple concussions and CTE. Defense counsel then reiterated their position that the connection between the required mens rea and CTE, which the People still asserted was lacking, was a question for the jury.

¶ 15    Later in the trial, Bannan called two of these experts — Dr. John Hughes and Dr. Gregory Hipskind.  The People objected to parts of Dr. Hughes's testimony on the basis that it was beyond the scope of his report, and the trial court sustained those objections. As Bannan argues on appeal, this testimony included the following:

- Defense counsel asked, "And what happens to the brain internally when somebody has one of these external concussive —"  Dr. Hughes answered, "According to the famous neurologist Robert Cantu, the brain goes into a —" The prosecutor interrupted him, objecting that the

testimony was "beyond the scope of the opinion that was discovered in this particular case."

- Dr. Hughes testified about his opinion that Bannan suffered from a traumatic brain injury. During that testimony, he began speaking about Bannan's computed tomography angiogram that showed microvascular defects. The prosecutor objected, explaining that "[n]o such document has been provided in discovery" and "[n]or is it cited in . . . the expert's report."

- Defense counsel asked, "And how long can symptoms from one concussion affect somebody?" Dr. Hughes responded, "A lifetime." The prosecutor objected that this was "beyond the scope of the report provided by this expert." The trial court sustained the objection and asked the jurors to disregard the answer.

- Defense counsel asked, "Dr. Hughes, in [Bannan's] case, the traumatic brain injury, was it caused from one concussion?" The prosecutor objected that this was "beyond the scope of the material provided by this expert."

- Defense counsel asked, "People with executive function limitations, would you expect to see them running late because of the decision-making aspect?" Dr. Hughes responded, "[y]es." The prosecutor objected that this was "beyond the scope of this expert's opinion." The trial court sustained the objection and asked the jury to disregard the response.

- Defense counsel asked if Dr. Hughes's opinion would change if Bannan had been taking Adderall. Dr. Hughes responded that "[i]f [Bannan] had been taking excessive amounts of Adderall, that could have potentially pushed him over the edge. I have had patients with traumatic brain injury have seizures due to —" The prosecutor interrupted, objecting that this was "well beyond the scope of this witness's provided report."

¶ 16    Finally, during the testimony of another defense expert, Dr. Karen Fukutaki, the trial court sustained an objection that her testimony regarding when Bannan had brain surgery to place a shunt in his brain was beyond the scope of the records she reviewed.

## 2. Analysis

¶ 17 We address whether the trial court reversibly erred when it limited defense experts to testifying about matters contained in their reports. We conclude that it didn't.

### a. Standard of Reversal

¶ 18 We first discuss the proper standard of reversal. Bannan contends that we should review his contentions for constitutional error because the court's rulings deprived him of a meaningful opportunity to present a complete defense. *People v. Cline*, 2022 COA 135, ¶ 70. But such a deprivation only occurs "where the defendant was denied virtually his only means of effectively testing significant prosecution evidence." *People v. Conyac*, 2014 COA 8M, ¶ 93. That isn't the case here. The trial court's ruling that the defense experts could testify to only what was in their reports didn't virtually deny him of his only means of responding to the People's case. In fact, the experts were still able to testify to a wide variety of opinions. *See Cline*, ¶ 79 (explaining that the defendant "had ample opportunity to present evidence" through cross-examination of the prosecution's witnesses and direct examination of his witnesses).

¶ 19     Also, Bannan presented evidence during trial to support his theory of defense. His defense included testimony from two experts who testified that Bannan suffered from a traumatic brain injury and to the effects of such an injury, as well as that he was prescribed about one hundred and fifty percent of the maximum recommended dose of Adderall.

¶ 20     The defense also called witnesses to testify about Bannan's history of concussions. One of his ex-teammates testified that he witnessed Bannan sustain many head injuries while playing football. And an expert opined that Bannan suffered from "hundreds to thousands of concussions" in his career. Upon our review of the record, Bannan was permitted to present evidence about his mental state, including the effect of multiple concussive events and a traumatic brain injury. Therefore, Bannan was still able to present a defense and rebut the People's evidence. *See People v. Lanari*, 926 P.2d 116, 122 (Colo. App. 1996) (concluding that a defendant wasn't denied his constitutional right to present a defense when defense witnesses testified to his state of mind before and after the offense).

¶ 21    In sum, because the trial court's ruling still permitted the experts to testify to what was in their reports, including testimony about his mental state, we can't say that it barred Bannan from subjecting the prosecution's case to "meaningful adversarial testing." *Krutsinger v. People*, 219 P.3d 1054, 1061 (Colo. 2009). Therefore, the non-constitutional harmless error applies. Under that standard, "reversal is required only if the error affects the substantial rights of the parties." *Hagos v. People*, 2012 CO 63, ¶ 12. Meaning, "we reverse if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Id.* (citation omitted).

### b.    Any Error was Harmless

¶ 22    Now, applying that standard, and assuming that the trial court abused its discretion in ordering Bannan's expert witnesses to testify to only matters in their reports, we conclude that any error was harmless, as defense counsel didn't make an adequate offer of proof — either to the trial court or us on appeal — as to what the experts would have testified to that was outside of their reports had they been permitted to do so and why that proffered testimony would have been materially helpful to Bannan's theory of defense.

*See People v. Drake*, 748 P.2d 1237, 1245-46 (Colo. 1988) (concluding that any error by the trial court in sustaining the prosecution's objections to certain portions of a defense expert's testimony wasn't sufficiently prejudicial to warrant reversal because "the defendant did not make an offer of proof to the trial court to establish for the record precisely what [the expert] would have said, had he been permitted to testify"); *People v. Hise*, 738 P.2d 13, 16 (Colo. App. 1986) (explaining that failure to give a sufficient offer of proof left the reviewing court unable to determine in what way the exclusion of evidence was prejudicial and so any error was harmless). We reach this conclusion because we can't discern from the record that the defense was seeking to offer any evidence establishing a link between CTE and the ability to form criminal intent.

¶ 23    Defense counsel did represent to the trial court that some of their experts, if permitted to, could testify to a reasonable degree of medical probability that Bannan suffers from CTE. But this offer of proof is missing any link to how suffering from CTE likely affected Bannan's ability to formulate the requisite mental state for the crimes charged. Defense counsel only vaguely mentioned that,

13

when considered in the aggregate, the sum of the defense experts' testimony might show this connection. But when the trial court directly asked defense counsel whether their witnesses could testify that Bannan's likely CTE prevented him from formulating the requisite mental state, defense counsel said no and explained that was an ultimate conclusion that was left for the jury. Notwithstanding this, the record doesn't reveal the details of what each expert would have said beyond what was already in their reports. And without this link, we can't conclude that Bannan was prejudiced by any error in excluding testimony about whether he likely suffers from CTE.

¶ 24    The trial court recognized that testimony about the nexus between CTE and Bannan's ability to form the requisite mental state was likely admissible. The court said that to the extent it found that there was an "expert whose expertise permits that witness to render an expert opinion that [Bannan] presented consistent with other individuals who have later been diagnosed with CTE, the [c]ourt may be in a position of permitting that testimony." Therefore, it's unclear if the trial court even would have sustained an objection by the prosecutor that such testimony was

outside the expert's report had the defense sought to have their experts testify to this.

¶ 25    Also, Bannan's experts were still permitted to testify to the opinions contained in their report, which included Dr. Hughes's opinion that Bannan suffered from a traumatic brain injury, Dr. Hipskind's opinion that Bannan had a "classic traumatic brain injury pattern", and Dr. Fukutaki's opinion that Bannan was prescribed about one hundred and fifty percent of the maximum recommended dose of Adderall.  All this testimony supported his theory of defense.  *See Drake*, 748 P.2d at 1246 (recognizing that, in analyzing whether a defendant was sufficiently prejudiced by excluded portions of his expert's testimony, that the jury was still informed of the expert's opinion).

¶ 26    Simply put, without a sufficient offer of proof, we can't conclude that the excluded testimony about whether Bannan suffered from CTE prejudiced him.  *See Lanari v. People*, 827 P.2d 495, 503 (Colo. 1992) ("An offer of proof also serves the important purpose of establishing a basis in the record for appellate review of the trial court's ultimate ruling.").  And when we look at the testimony Bannan asserts was improperly excluded on appeal, none

of it addresses this missing nexus. Similarly, since we don't have an offer of proof as to what the answers would have been to the seven questions to which objections were sustained, we can't say the court's ruling on these objections prejudiced Bannan. *See Rhodig v. Cummings*, 418 P.2d 521, 502 (Colo. 1966) (concluding there was no reversible error when the trial court precluded defense experts from testifying to certain matters because "the defendant failed to make an offer of proof to show to the trial court or this [c]ourt what the testimony of the doctors" would have been); *cf. People v. Sandoval*, 805 P. 2d 1126, 1128 (Colo. App. 1990) (concluding that the trial court erred in excluding evidence and such exclusion wasn't harmless because "defense counsel made an offer of proof" that "defendant's abnormal behavior [was] *caused* by his underlying, psychological condition" (emphasis added)).

¶ 27 Accordingly, we conclude that any error by the trial court in limiting the defense experts' testimony to their reports was harmless.

### C. Scope of Lay Witness Testimony

¶ 28 Second, Bannan contends that the trial court erred when it ruled that one of his lay witnesses, Mitchell Unrein, couldn't testify

16

that Bannan's "brain was sick" because such testimony was an expert opinion. He also contends that the trial court erred when it sustained the People's objection to testimony from Unrein and Beau Williams (a lay witness called by the People) about their personal experiences with concussions on relevance grounds. We disagree with both contentions.

### 1. Additional Facts

¶ 29 Both Unrein and Williams are former NFL players. On the first day of trial, defense counsel explained to the trial court that he intended to call lay witnesses to opine that Bannan's "brain was sick" and that Bannan "didn't seem normal" to them. The trial court explained that it would sustain an objection to the former statement because it was "in the way of a diagnosis."

¶ 30 Then during trial, the trial court sustained the People's objections to the lay witnesses testifying about their own personal experience with brain trauma due to playing football. Unrein testified that "[b]ut, for me, I'm like — I was going through the same thing. So, like, when he was going through all that, I mean, I — your mind starts playing tricks on you. It's — you can't control what your thoughts are." The People objected that this was

17

improper expert testimony. After a discussion at the bench, the trial court ruled that if Unrein was referring to his own mind, such testimony was irrelevant. The trial court also sustained the People's relevance objection as to Williams's testimony about his own personal experience of being knocked out while playing football.

### 2. Applicable Law

¶ 31 CRE 701 provides that

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

¶ 32 And section 16-8-109, C.R.S. 2025, provides that

> In any trial or hearing in which the defendant's mental condition is an issue, a witness not specially trained in psychiatry or psychology may testify as to the witness's observation of the defendant's actions and conduct, and as to conversations that the witness has had with the defendant bearing upon the defendant's mental condition, and the witness must be permitted to give opinions or conclusions concerning the defendant's mental condition.

18

¶ 33    In interpreting this statute, the Colorado Supreme Court has explained that it doesn't "allow[] a lay witness to opine as to a defendant's specific diagnosis." *Dunlap v. People*, 173 P.3d 1054, 1098 (Colo. 2007).

¶ 34    Further, evidence must be relevant to be admissible. CRE 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

### 3.    Analysis

¶ 35    First, the trial court didn't abuse its discretion by precluding Unrein from testifying that Bannan's "brain was sick" pursuant to CRE 702, as such testimony can be reasonably characterized as offering a diagnosis. *See Dunlap*, 173 P.3d at 1098. In reaching its conclusion that the precluded testimony was inadmissible, the court distinguished it from Unrein's permissible lay opinion that Bannan "didn't seem normal" to him. We can't say that the trial court abused its discretion in drawing the line that it did.

¶ 36    Second, Bannan argues that the trial court erred in sustaining the People's objections on relevance grounds to witnesses testifying

to their own personal experiences with brain trauma.  He contends that the testimony was proper under CRE 701 and section 16-8-109.  Specifically, he argues that the statute allows lay opinions based on personal experience, and that the excluded testimony was proper because it helped lay the foundation for witnesses' lay opinions as to Bannan's mental state.  We aren't persuaded.

¶ 37    While section 16-8-109 allows a lay witness to testify as to their personal experience with the *defendant's* mental condition, it doesn't permit the witness to testify regarding their own personal experience generally.  *See* § 16-8-109 (explaining that a lay witness "may testify as to the witness's observation of the *defendant's* actions and conduct" (emphasis added)).

¶ 38    Moreover, the two foundational requirements "which must be met before a lay witness can express his opinion as to the sanity of another" are "(1) it must be shown that the lay witness had an adequate means of becoming acquainted with the person whose sanity is in issue, and (2) the contacts must be proximate in time to the alleged offense." *People v. Medina*, 521 P.2d 1257, 1259 (Colo. 1974).  A witness's personal experience with head trauma doesn't help establish either of these foundational requirements.  And the

People don't dispute that Bannan laid the proper foundation for both Unrein and Williams to testify about Bannan's mental status. But we reject Bannan's contention that the witnesses' testimony about their own experience with head trauma was proper foundational testimony. Bannan also hasn't explained why this testimony tended to make a fact of consequence more or less probable. CRE 401. Accordingly, we conclude that the trial court didn't abuse its discretion by limiting the scope of lay witness testimony as it did at trial.

### D. Scope of Cross-Examination of Prosecution Witnesses

¶ 39 Next, Bannan argues that the trial court erred by sustaining the People's beyond the scope and relevancy objections during Bannan's cross-examination of three prosecution witnesses. We discern no abuse of discretion.

### 1. Beyond the Scope of Direct Examination

¶ 40 CRE 611(b) provides that cross-examination "should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness" but that "[t]he court may, in the exercise of [its] discretion, permit inquiry into additional matters as if on direct examination." The beyond the scope objections that

Bannon challenges on appeal came during the testimony of Dr. John Geraghty, who was Bannan's team doctor when he played for the Broncos and continued treating Bannan after Bannan stopped playing football.

¶ 41    Dr. Geraghty's testimony on direct examination focused on his treatment of Bannan for attention deficit disorder (ADD), including Bannan's ADD symptoms, Dr. Geraghty prescribing Bannan Adderall, Bannan's request to refill that prescription, his conversations with Bannan about the risks and dangers of Adderall, the amount of Adderall he prescribed for Bannan, and his subsequent decision to switch Bannan's prescription from Adderall to Provigil.  The People also asked Dr. Geraghty two questions about concussions — one, if he recalled treating Bannan for a concussion in March 2019 (he said he didn't); and two, if he recalled whether Bannan had any concussions after his NFL career (he wasn't aware of any).  In sum, Dr. Geraghty's direct testimony centered on him prescribing Bannan Adderall.

¶ 42    As relevant here, the People objected five times during defense counsel's cross-examination of Dr. Geraghty.  The trial court sustained all five of the objections, ruling that the questions were

beyond the scope of the direct examination.  Those questions were as follows:

(1) "So you're aware that [Bannan] had brain surgery in October 2020?"

(2) "And, Dr. Geraghty, have you reviewed the records from Mr. Bannan's other physicians?"

(3) "Have you ever reviewed a SPECT scan done of Mr. Bannan?"

(4) "Have you reviewed a report in this case drafted — or written by Dr. Fukutaki?"

(5) "Were you aware of Mr. Bannan having brain trauma?"

¶ 43    Also during Dr. Geraghty's testimony, defense counsel asked him a sixth question that is pertinent to the appeal,

(6) "And when you met with Mr. Bannan, the first time you met with him for a physical after the . . . October 16th, 2019, shooting incident, did you discuss any other concerns that he had, medically speaking, in ongoing treatment?"

¶ 44    The People objected that this question was beyond the scope of direct examination, and the trial court told defense counsel to

narrow the question "as to the discontinuation of the Adderall." Defense counsel then asked, "Doctor, this is when you discontinued Mr. Bannan's Adderall, right?"

¶ 45 Bannan argues that defense counsel asked all six of these questions to impeach Dr. Geraghty's credibility, so the court abused its discretion in sustaining the objection as beyond the scope of direct examination. We aren't persuaded that the court abused its discretion.

¶ 46 Again, Dr. Geraghty's testimony on direct centered on prescribing Bannan Adderall, which started around 2013, and the symptoms Bannan was experiencing related to ADD. At no point did the People ask Dr. Geraghty about reports or recommendations from other health care providers. Therefore, defense counsel's questions on cross-examination weren't "germane to the direct examination" and didn't "qualify[] or destroy[] it, or tend[] to elucidate, modify, explain, contradict, or rebut testimony." *People v. Sallis*, 857 P.2d 572, 574 (Colo. App. 1993). Dr. Geraghty only testified on direct as to *his* opinions and treatment of Bannan for ADD.

¶ 47    And we aren't persuaded that defense counsel's questions relating to other doctors went to Dr. Geraghty's credibility and thus should have been allowed.  Bannan has failed to explain why Dr. Geraghty's review, or failure to review, other doctors' reports or recommendations would impugn his credibility.  Dr. Geraghty prescribed Bannan Adderall, and we fail to see how his alleged failure to review all of Bannan's other medical records would have undermined his testimony about Bannan's Adderall prescription and symptoms.  And even if such questions implicated Dr. Geraghty's credibility, the trial court could have reasonably found that the danger of confusing the jury — because it implicated issues not related to Dr. Geraghty — outweighed any probative value to his credibility.  Therefore, the trial court didn't abuse its discretion in sustaining the People's objection to defense counsel's questions to Dr. Geraghty about Bannan's other doctors' reports and recommendations.  *See People v. Marin*, 686 P.2d 1351, 1353 (Colo. App. 1983) ("The right of cross-examination extends only to areas encompassed in direct examination, and anything outside of direct examination is completely discretionary with the court.").

¶ 48    The trial court also didn't abuse its discretion by sustaining the People's objections to defense counsel's questions about Bannan's brain trauma for being beyond the scope of direct examination. Again, the People didn't ask Dr. Geraghty about these topics on direct examination, so it was within the trial court's discretion to not allow defense counsel to ask Dr. Geraghty about them on cross-examination.

¶ 49    In fact, Dr. Geraghty testified on cross-examination that additional knowledge about Bannan's history of brain trauma wouldn't have impacted his decision to prescribe Adderall for his ADD. The trial court allowed the following exchange between defense counsel and Dr. Geraghty on cross-examination right before the fifth question:

> [DEFENSE COUNSEL]: And you would be . . . concerned about somebody taking Adderall with concussions; isn't that right?
>
> [DR. GERAGHTY]: Actually, through other doctors that I have interacted with who have dealt with brain traumas, it's not an unusual medication to use.

¶ 50    This testimony established that any trauma to Bannan's brain wouldn't have been a concern for Dr. Geraghty when he was deciding whether to prescribe Adderall to Bannan.

¶ 51    And the People's two questions on direct examination about concussions don't change this analysis.  These specific questions about Bannan's concussion history didn't open the door for defense counsel to ask Dr. Geraghty more generally about brain trauma and Bannan's other doctors' opinions on cross-examination because they focused on Dr. Geraghty's own knowledge of Bannan's concussion history, of which he had none.  Accordingly, we discern no error in any of the trial court's rulings regarding these six questions.

## 2.    Relevance

¶ 52    Bannan challenges the court's ruling sustaining three relevance objections raised by the People.  We address each question, in turn, below.

¶ 53    The first question was to Dr. James Kelly, the People's expert witness in neurology and traumatic brain injury.  Right before the question challenged on appeal, Dr. Kelly had testified that Bannan had some limitation in moving his neck.  Defense counsel then

asked, "And what was the limitation? He couldn't turn his head all the way around?" The trial court sustained the People's objection to this question on relevance grounds.

¶ 54 Bannan argues that the details of his neck injury were relevant because they would have supported an inference that his brain injury was more severe than one unaccompanied by a neck injury. But Bannan doesn't explain why whether he had limited ability to turn his neck to the side as opposed to a limited ability to bend it up and down makes it more or less likely that he suffered a severe brain injury. *See People v. Moore*, 2021 CO 26, ¶ 33 ("[E]vidence that is 'relevant to the issue of insanity' is evidence that tends to prove or disprove the issue of insanity — that is, evidence that is probative of what is defined as insanity." (quoting § 16-8-107(3)(a), C.R.S. 2025)). So, we discern no abuse of discretion in the trial court's relevancy ruling.

¶ 55 The second question was to Dr. Charles Harrison, who conducted Bannan's first sanity evaluation. The People asked him, "Did [Bannan] express to you any additional treatment that he had other than [lumbar punctures, barometric treatments, oxygen chambers, and stem cell treatments] or had planned to have?"

28

¶ 56    Bannan argues that understanding the treatment he had or planned to undergo *after* the shooting was relevant to his claim that he had a mental condition that prevented him from forming the required mens rea.  But, again, Bannan doesn't explain why other treatments, especially any planned for the future, would have impacted his ability to form the requisite mens rea at the time of the offense.  Without that connection, we discern no abuse of discretion in the trial court's refusal to permit defense counsel to ask this question.

¶ 57    The third question was to Dr. Geraghty.  After previously prescribing Adderall to treat Bannan's ADD, Dr. Geraghty changed the prescription to Provigil.  After confirming with Dr. Geraghty that a patient could get "no refills" on a single Adderall prescription, defense counsel asked, "[I]n 2019, Provigil had . . . only three refills [that] could be allowed . . .?"

¶ 58    Bannan argues that because more refills are allowed for Provigil than for Adderall, that means Provigil isn't as highly regulated as Adderall, indicating that there are greater risks associated with taking Adderall.  Therefore, he argues, this question was relevant to his defense that he was involuntary intoxicated due

to his high Adderall prescription. Bannan asks us to infer that because Adderall is more regulated than Provigil, there are more risks to taking Adderall. But he hasn't provided evidence of this inference, and without that, we discern no abuse of discretion by the trial court in excluding this testimony on relevancy grounds.

¶ 59 Accordingly, the trial court didn't abuse its discretion in sustaining relevance objections to these three questions.

### E. Scope of Cross-Examination of Defense Witness

¶ 60 Bannan next argues that the trial court abused its discretion by allowing the People to elicit irrelevant testimony from Dr. Fukutaki, a defense expert witness. Again, we disagree.

### 1. Additional Facts

¶ 61 After pleading NGRI, Bannan underwent his first sanity evaluation per the trial court's order. The evaluating doctor opined that Bannan was sane at the time of the offense. After that evaluation was completed, Bannan requested that the trial court order a second sanity evaluation to be completed by a different evaluator, Dr. Fukutaki, pursuant to section 16-8-108(1)(a), C.R.S. 2025. The trial court granted his request, explaining that an independent order for an evaluation would issue and that the

30

interview must be video and audio recorded, as required by statute. *See* § 16-8-108(1)(a). But due to an administrative error by the court, the order issued was for a second *competency evaluation*, not for a sanity evaluation. Competency evaluations aren't required to be recorded. *See* § 16-8.5-102 to -103, C.R.S. 2025.

¶ 62 A couple of weeks later, Bannan filed a motion to clarify this order. In response, the trial court set aside the mistaken competency order and issued a new order for a second sanity evaluation to be completed by Dr. Fukutaki. But before the corrected order issued, Dr. Fukutaki completed her evaluation of Bannan. Thus, at the time of her evaluation, the only order she had from the court was for a competency evaluation. Dr. Fukutaki didn't audio or video record the interview.

¶ 63 Bannan called Dr. Fukutaki to testify as an expert at trial. Before her testimony, Bannan asked that the trial court exclude as irrelevant any testimony or questioning regarding her evaluation not being recorded pursuant to section 16-8-108(1)(a). The People explained that they intended to ask questions on the matter because Dr. Fukutaki's decision to not record the evaluation went "directly to her bias and motive, and any assertion that

Dr. Fukutaki was unaware that a sanity evaluation had been ordered in this case lacks credence based on the fact that she took the unusual step, in a competency evaluation, to address the issue of insanity." Indeed, after opining that Bannan was competent to proceed, Dr. Fukutaki wrote that Bannan "denied guilt for the charges he faces. He reported his gun accidentally discharged, leading to the injury [A.M.] suffered. Therefore, offering an opinion regarding sanity appears unethical." The trial court ruled that it might permit the People's questions if it determined that they bore on Dr. Fukutaki's credibility or bias.

¶ 64    As relevant here, the trial court overruled Bannan's objections to the People's cross-examination of Dr. Fukutaki on three occasions. The questions by the People were as follows:

- "Doctor, are you aware that the Court in this case issued an order on November 20th, 2020, authorizing you to conduct a sanity evaluation in this case at the request of [defense counsel]?"

- "You would agree, Doctor, that the statute requires sanity evaluations be recorded?"

- "And you would agree, Doctor, that when we're talking about a competency evaluation, as it's authorized by statute, that a competency evaluation as authorized by statute does not address issues of sanity?"

### 2. Applicable Law

¶ 65  "[T]he partiality of a witness is always relevant." *Margerum v. People*, 2019 CO 100, ¶ 10.  Indeed, "when a witness testifies against a party, the party has a right to impeach that witness's credibility." *Id.* at ¶ 11.  "Any witness's credibility can be attacked by unearthing any potential source of impartiality, such as bias or an ulterior motive." *Id.* at ¶ 10.  But a trial court must exercise its discretion to preclude inquiries that "have little effect on the witness' credibility but would substantially impugn [their] moral character." *People v. Taylor*, 545 P.2d 703, 705 (Colo. 1976).

### 3. Analysis

¶ 66  Bannan argues that the trial court erred in overruling his objections to three of the People's questions of Dr. Fukutaki on cross-examination.  Specifically, he argues that the testimony was irrelevant, not probative of her credibility, and misleadingly impugned her character.  We disagree with each contention.

33

¶ 67    The trial court didn't abuse its discretion in concluding that the three questions identified above were relevant to Dr. Fukutaki's credibility as a defense expert witness. The timing of events is critical to reaching this conclusion. Although the court issued the corrected order for a sanity evaluation after Dr. Fukutaki completed the competency evaluation, it did so before she completed her report. And it's certainly a reasonable area of inquiry as to why Dr. Fukutaki opted not to perform a statutorily compliant sanity evaluation after receiving the corrected order. In other words, it was the People's proposition that Dr. Fukutaki could have redone the evaluation as a sanity evaluation pursuant to the new order. Therefore, we can't conclude that it was an abuse of discretion for the trial court to permit the People to inquire into Dr. Fukutaki's reasoning for not recording the evaluation or even re-doing the evaluation pursuant to the new order. Indeed, Bannan had filed the motion to clarify (explaining that the court's order should have been for a sanity evaluation) three days before Dr. Fukutaki completed her evaluation. And Dr. Fukutaki didn't file her written report with the court until almost four months after the court issued the corrected order. Therefore, the trial court didn't abuse

its discretion in overruling Bannan's objections because the circumstances suggested that Dr. Fukutaki could have known that the competency order was a mistake and that she should have been conducting a sanity evaluation. *See Ross v. Colo. Nat'l Bank of Denv.*, 463 P.2d 882, 887 (Colo. 1969) ("[O]nce a witness testifies as an expert, he subjects himself to the most rigid kind of cross-examination . . . ."); *see also People v. Houser*, 2013 COA 11, ¶ 58 ("[C]ourts have wide latitude to reasonably limit cross-examination . . . ."). So, the People could inquire into these circumstances.

¶ 68 Furthermore, these questions didn't cross the line from impeaching her credibility to impugning her character. Again, these questions related to court orders and an evaluation for the pending case. *Cf. People v. Cole*, 654 P.2d 830, 833-34 (Colo. 1982) (explaining that questions about "unrelated arrests and citizen complaints of the use of excessive force" of a police officer was a "direct attack upon the general character of the witness"). Dr. Fukutaki could have had a reasonable explanation for why she didn't record the evaluation or why she didn't conduct a new sanity

evaluation. Nothing about this line of inquiry impugned her character.

¶ 69 Accordingly, we discern no error by the trial court in overruling Bannan's relevance objections to the People's cross-examination of Dr. Fukutaki.

## F. Surrebuttal Expert Witness

¶ 70 Fifth, Bannan argues that the trial court erred by denying his request to call an expert witness, Dr. Kevin Lillehei, in surrebuttal. We disagree.

### 1. Additional Facts

¶ 71 Both Bannan and the People endorsed Dr. Lillehei as an expert witness but neither side ended up calling him to testify in their case-in-chief. The People presented twelve witnesses in their rebuttal case, none of whom were Dr. Lillehei. After the People's presentation of their rebuttal case, Bannan requested that he be allowed to call Dr. Lillehei as a surrebuttal expert witness.

¶ 72 After hearing argument from both sides on this request, the trial court explained that it "agree[d] [with the People] that it is appropriate to consider surrebuttal only in instances where there is presentation in the rebuttal case of evidence that then permits a

surrebuttal case, which in the [c]ourt's opinion in this instance, there was not." The trial court then denied Bannan's request to call Dr. Lillehei in surrebuttal.

## 2.    Applicable Law

¶ 73    "A decision whether to allow surrebuttal generally lies within the discretion of the trial court." *People v. Brockman,* 699 P.2d 1339, 1342 (Colo. 1985). But "trial courts should permit defendants to introduce evidence on surrebuttal that tends to meet new matter presented by the prosecution on rebuttal." *People v. Terry,* 720 P.2d 125, 129 (Colo. 1986).

## 3.    Analysis

¶ 74    Bannan argues that in denying his request to call Dr. Lillehei in surrebuttal, the trial court misapplied the law — and thus abused its discretion — because the trial court misapprehended the scope of its discretion. It did so, he argues, because the court erroneously explained it could only allow surrebuttal if new matter was introduced on rebuttal, but the law is that the court does have discretion to allow surrebuttal even if new matter hadn't been presented on rebuttal. The People respond that the trial court recognized it had discretion to allow surrebuttal even if rebuttal

37

didn't introduce new matter and exercised that discretion to not permit surrebuttal because there wasn't a reason to do so based on its assessment of the evidence.

¶ 75     To be clear, Bannan doesn't contend on appeal that he sought to call Dr. Lillehei in surrebuttal to respond to new information presented by the People in their rebuttal case.  Therefore, it was within the trial court's discretion to deny Bannan's request for Dr. Lillehei to testify in surrebuttal.  *People v. Martinez*, 506 P.2d 744, 745 (Colo. 1973).

¶ 76     And we aren't persuaded that the trial court improperly exercised this broad discretion.  To be sure, the trial court stated that "it is appropriate to consider surrebuttal only in instances where there is presentation in the rebuttal case of evidence that then permits a surrebuttal case."  This, however, wasn't a misapplication of the law.  The trial court didn't say that it could *only* permit surrebuttal if new matter had been presented on rebuttal, as Bannan argues.  Instead, the trial court explained when it considered surrebuttal proper (i.e., "where there is presentation in the rebuttal case of evidence that then permits a surrebuttal case") and then found that those circumstances weren't present for

Bannan's case. This wasn't an abuse of discretion by failure to exercise discretion because the court, contrary to Bannan's argument on appeal, seemed to have exercised its discretion in denying Bannan's request. Put differently, the trial court didn't abuse its discretion by not allowing Bannan to call a surrebuttal witness when the law didn't require the trial court to allow him to call such a witness and it explained that it didn't believe the proposed surrebuttal was proper for Bannan's case, thereby exercising its discretion.

¶ 77    Accordingly, we conclude that the trial court didn't abuse its discretion in denying Bannan's request to call Dr. Lillehei in surrebuttal.

## G.    Cumulative Error

¶ 78    Finally, Bannan contends that the cumulative effect of the errors asserted on appeal requires reversal. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not. Stated simply, cumulative error involves cumulative prejudice." *Howard-Walker v. People*, 2019 CO 69, ¶ 25.

¶ 79    We have assumed that the trial court erred regarding Bannan's first issue on appeal.  But we concluded that any error was harmless and didn't prejudice him.  We reached this conclusion because Bannan didn't explain what his experts' testimony would have been had the trial court allowed the experts to testify to matters outside their reports.  Without this offer of proof, again, we're unable to articulate how this missing testimony prejudiced Bannan.  Therefore, because there is no articulation of prejudice to Bannan from the only error we assume on appeal, the cumulative error doctrine doesn't provide an independent basis for reversal.  *See People v. Thames*, 2019 COA 124, ¶ 69 ("[A] single error is insufficient to reverse under the cumulative error standard.").

## III.    Disposition

¶ 80    The judgment is affirmed.

JUDGE GROVE and JUDGE JOHNSON concur.